14937

NELSON v. ATLANTIC COAST LINE R. CO.

(4 S. E. (2d), 273)

September, 1937.

*Messrs. Douglas McKay* and *Reynolds & Reynolds,* for appellant,

*Messrs. Epps & Epps* and *Henry C. Jennings,* for respondent,

August 28, 1939.

The opinion of the Court was delivered by MR. A. L. GASTON, ACTING ASSOCIATE JUSTICE.

On a Sunday evening, October 6, 1935, Dallas Nelson, plaintiff's intestate, lost his life as the result of injuries sustained while he was engaged in attempting to alight from defendant's train at its station at Lynchburg, after he had boarded the train for the purpose of assisting his friend Elise McElveen to board the train as a passenger to Baltimore. Both of these parties were young colored people. He was discovered immediately after the train pulled out lying on the main line track between the rails about the frog of the house track in a badly mangled condition, with one leg cut off and the other badly crushed. He died on the way to the hospital. This suit was for damages for the conscious pain and suffering of the deceased caused by the alleged negligent and willful acts of the defendant. Actual and puni-

tive damages were sought and were recovered under the verdict of the jury.

The actual manner and proximate cause of his injury are in dispute. The complaint alleges that the defendant "suddenly started the train in motion while Dallas Nelson was endeavoring to return from the place in the coach to the yard, and it being dark he attempted to alight from the coach upon the invitation and encouragement of the defendant company, and as the train was starting off, stepped among the crossties and tracks, fell and was so grievously wounded that he suffered pain, mental anguish and torture for several hours until he died."

The answer contains a general denial, and also by way of defense pleads contributory negligence and willfulness, in these words, to wit, "that although the train stopped at the station at Lynchburg for the usual and reasonable time to allow passengers to embark and disembark and while the defendant had no means of knowing (that) the plaintiff's intestate did not intend to become and remain a passenger on the train, yet, nevertheless, if he remained upon said train until it started from the station and after it had gotten fairly under way, without even slight regard for his own safety, he rushed to the platform and jumped off the moving train."

At the close of plaintiff's testimony defendant's motion for a nonsuit was refused, and at the conclusion of the entire case its motion for a directed verdict was refused. A motion for a new trial was duly made and refused. The defendant's attorneys argue the exceptions under three points, to wit: (1) That the verdict should have been directed for the defendant on the ground of insufficient evidence of negligence to submit the case to the jury, particularly in view of the fact that there is nothing to show how plaintiff's intestate met his death; (2) that the Court should have directed a verdict on the issue of willfulness, since under no view of the facts could willfulness be imputed to the defendant, and even if negligence might be inferred on its part,

there is no evidence that such negligence was a proximate cause of the injury; (3) that the Court erred in charging the jury where more than one conclusion might be reached a jury might select one and "thus destroyed the efficacy of the charge as to burden of proof," also that the Court erred in charging that a juror is not a fit man to serve if he would not yield his "pride of opinion" to reach a verdict.

The first point raised by the exceptions will be considered. Was the evidence sufficient to carry the case to the jury on the issue of negligence as the proximate cause of the injury and death?

Elise McElveen testified that this was her first trip to Baltimore. She and several of her friends rode together in one automobile from her home, and got to the station at Lynchburg two hours before train time. The train got there at 6:30 p. m. It was dark then; the station yard was dark; no lights were lit. There was a circus train also at the depot. When the passenger train arrived, it was all crowded and she had to push her way through to get to the train. Some one had a flashlight at the steps and that was the only way you could see to get to the steps. She got on the front end of the coach for colored people, carrying two large boxes. Dallas Nelson was carrying her heavy suit case. She testified that neither the conductor nor porter was there to help her; that she got on the train and took the third seat from the front. Dallas placed the suit case at her feet, started out without stopping to say goodbye. The train started off and was leaving Lynchburg before she put her suit case in the rack and got seated. The last she saw of Dallas he was making his way toward the door and she did not hear of his death until she arrived at Baltimore.

Wesley McElveen, one of the witnesses for the plaintiff, testified that he saw Elise and Dallas get on the train; that Dallas put the suit case down at the third seat and turned around, starting back; just at this time the train started moving—"The next I saw of Dallas he was lying upon the

track all mashed up and suffering. His limbs, legs and arms were mashed up. The policeman was flashing a light on ,him." "He was about the frog where the side track and main line join—they had dragged him there; there was blood and flesh on the road from somewhere right at the end of the depot where he fell out it looked like." "His body was found sixty or sixty-two yards from the depot. He was praying and asking for help and mercy." .

Garish and Eva McElveen also testified for the plaintiff to the effect that "at the steps of the train where Elise and Dallas got on there was a colored man, called Tony, acting as a porter. I heard Dallas ask the man could he take the suit case on the train for the girl and he said 'Yes, hurry off.' This man went inside the train when it started off." The witnesses for the plaintiff corroborated each other as to main facts, except Elise did not see the porter or hear the talking between him and Dallas.

The evidence for the defense shows that the train was at the station two minutes; no difficulty to see as the usual lights were around the station; seven passengers got off the white coach and several colored passengers alighted, also. Mr. J. C. Marshall, who was a passenger to get off, says he "heard after getting home that the negro was killed and it was presumably getting off the train that killed him." Mr. F. E. Blatner, engineer in charge of the Johnny Jones carnival train, which was on the pass track, says that his train pulled out immediately after the passenger train, and that he saw an object on the track, stopped his train, after passing the object thirty or forty feet, and found the injured boy, Dallas Nelson. H. F. Powell, town policeman, went to the body at once and saw blood right from the depot; it began about fifty feet from where the head of the colored coach had stopped; the body was found one hundred feet from the point where blood first was found, or one hundred fifty feet from the point where the colored coach stopped. The injured man was in his good mind, one leg was cut

completely off and the other was mashed, but saw no injury around the head. Two doctors were there. The testimony of R. L. White, baggagemaster on this train in question, was to the effect that it was also his duty to assist on the second class or colored coach; that Tony Hines got on the train at Sumter, dead-heading to Florence to catch his job out of there, and that Tony was off duty going back to report for work; that "I asked Tony to assist me in getting off passengers since I had other duties besides as baggagemaster"; the agent was not on duty at Lynchburg and there was no agency serving on Sunday for passengers at this station. R. L. White says, "The train stopped at Lynchburg. I went back and called the station, went to the front of the colored coach, found I had baggage, asked Hines to put the box down and get the people off." After receiving baggage R. L. White went back to the platform of the colored coach, "told Tony to come in, everything was all right." Four or five passengers got on. I went back to the door to see if everything was clear, asked Tony, and he said "O. K. Cap." The conductor pulled him ahead. "I went to the platform of the colored coach to see that the trap was down and the door shut. Tony got his box up and shut the door. After the train pulled ahead Tony threw his box up, closed the trap, then closed the door; the train had not started before he closed the trap. Saw no one come out of the colored coach trying to get off the train."

Tony Hines testified along the same line, and denied seeing Elise and Dallas get on the train, or talking with Dallas. He helped the passengers get on, closed the trap and the door and saw or heard nothing of Dallas attempting to leave the train. The flagman and the conductor also testified in the case along the same line and none saw or heard Dallas before he was injured.

In the light of the testimony which is set forth at some length, now, was the case properly submitted to the jury on the issue of negligence as the proximate cause of the in-

jury? His Honor, Judge Sease, overruled the motion for a directed verdict, on this ground, saying "I shall let the jury consider the verdict as to actual and punitive damages. Of course no one knows how this man came to his death, but circumstances—I have tried a lot of cases with circumstances, even in murder cases, a man may be convicted on circumstances, if the evidence shows it beyond a reasonable doubt. But, as counsel contends, if there is more than one reasonable inference, then the jury may take one or the other as a reasonable explanation, but of course it must be proved to the satisfaction of the jury. Motion refused." The Court also fully explained the law on this point in his charge. He first expounded the difference in the rule in criminal cases as to circumstantial evidence by saying that where circumstances are relied upon all of the circumstances must be proven beyond a reasonable doubt and all must point to a moral certainty to the guilt of the accused as charged. "But in a civil action, where either party or side may rely upon circumstances to establish a particular contention the rule is different. If there are more than one reasonable conclusion to be reached by the jury, then the jury may—it is for the jury to say which one, if any, such reasonable conclusion to draw from the circumstances. Now you cannot speculate in reaching a conclusion, neither can you rely upon suspicion."

The issue in the case of the alleged negligence of the defendant as the proximate cause of the injury depends largely upon the question of fact to be decided by the jury whether the defendant by its agents knew that Dallas was on the train to assist a passenger with the intention of at once getting off. Both sides realized this and the case was hotly contested on this plan of campaign. Accordingly none of defendant's witnesses or agents who testified could recall anything about Elise as a passenger nor anything about her escort. Yet it is an undoubted fact that Dallas got upon the train and attempted to leave it. The

greatest riddle or miracle in the case is how he could pass by the baggagemaster and the porter, to get on or off, and never be seen by either. Against this rather unreasonable conclusion is the positive testimony of at least two witnesses for the plaintiff that Dallas spoke to Tony and was told to get on and hurry off and later was actually seen in the coach, and actually put the suit case down. If the defendant knew that he went·on to carry the baggage of a passenger as her escort, the carrier in permitting him to enter with knowledge of his purpose is presumed to agree that he may execute it and is bound to hold the train a reasonable time therefor. *Cooper v. Atlantic Coast Line R. Co.,* 78 S. C., 562, 59 S. E., 704.

The earlier case of *Johnson v. Southern Ry. Company,* 53 S. C., 303, 31 S. E., 212, 213, 69 Am. St. Rep., 849, also holds that the carrier owed the escort the duty of giving him "a reasonable time to leave the train before it is put in motion." The appellant contends that the case at bar does not come within the doctrine of the two foregoing cases of Johnson and Cooper because when the train was moving the conductor urged Johnson to jump, and that the evidence in the *Cooper case* is the same, and both were injured by jumping. Appellant then contends that the latter ground particularly is lacking in the case at bar for no one knows how Nelson received his injuries and appellant concedes whereas from an extreme view of the testimony there might be an inference of negligence drawn in the starting of the train, there is no testimony that such negligence was a proximate cause of the injury. This admission for the sake of argument by appellant, of course, does not conclude the case and will not be used against the appellant, but if Tony Hines was an agent of the defendant, he had ample notice of the presence and purpose of Dallas upon the train and told him to hurry off. The officials of the defendant adopted Tony Hines as agent to let passengers on and

off of the colored coach. He was certainly the agent of the defendant *quoad hoc*.

Tony was a regular employee of the defendant and was familiar with the kind of work he was engaged in doing. The fact that Elise did not see him when she got in is natural, and goes to show her need of assistance by her escort. She was bound for a long journey on her virgin voyage to the Mecca of Baltimore, encumbered with much baggage and no doubt did not observe the presence of Tony, but Dallas saw Tony, they spoke, and the injunction to hurry was ringing in the ears of those nearby, who testified. She was a passenger of the defendant company, had paid her fare, had heavy baggage, and under the law of this State, no assistance having been proffered by the railroad company, the carrier owed her escort the duty of giving him a reasonably sufficient time to perform his object of placing the baggage and to leave the train before it was started. There is no doubt that the evidence in this case presented issues of fact for the jury to decide in regard to these matters.

Furthermore it was properly left to the jury to decide whether the alleged negligence in starting the train was the proximate cause of his hurry to get off of a moving train. It was for the jury to say whether under all of the facts and circumstances in the case he fell beneath the wheels in alighting from the moving train. The testimony all pointed to this conclusion as reasonable and probable. Some of the witnesses on both sides testified, without objection, "that it was presumably getting off the train that killed him." Surely the jury as reasonable men, under oath to try the case according to the evidence, was warranted in reaching this conclusion, when the evidence shows to a moral certainty that he was in the act of leaving the inside of the coach as the train began to move. The facts are plain and the case is not shrouded in such a maze of mystery as to suggest that the finding of the jury was fantastic, speculative, conjec-

tural or arbitrary, or based upon vagary, or unfounded, or unsupported by the weight of the evidence.

The conclusion is irresistible that the case was properly left to the jury on the issue of negligence as the proximate cause of the injury.

The same conclusion must be reached in regard to the issue of willfulness and punitive damages. Was there a conscious failure to observe due care or a failure to exercise slight care? The verdict of the jury, based on the evidence, finds that the defendant knew that Dallas was upon the train to assist a passenger with the intention and purpose of at once getting off. Yet the defendant took no precautions to ascertain if he was off, or if he had time to perform his mission and alight before the train moved forward, and before the doors were shut in his path of *egress* or *exit,* unless he hurried precipitantly to extricate himself from the peril in which he was placed by the negligence of the defendant, and by the sudden emergency with which he was confronted. This was a jury question under the testimony. *Wilson v. Southern Ry. Company,* 93 S. C., 17, 75 S. E., 1014; *Horne v. Atlantic Coast Line R. Co.,* 177 S. C., 461, 181 S. E., 642; *Key v. Charleston & W. C. Ry. Co.,* 144 S. C., 164, 142 S. E., 336.

> The right to recover punitive damages, of course, depends upon proof of willfulness on the part of the defendant. It is not essential that one agent alone was guilty of willfulness, but in this case the jury had the right under the testimony to consider the conduct of all of the agents of the defendant in charge of the train. It is true that there is no proof that the defendant's agent advised or told the deceased to jump to his death, and so no question of error of judgment is involved, but if "there is some evidence either direct or circumstantial of malice or willfulness or wantonness, then a recovery of punitive damages must be sustained."

The deceased was told to hurry off; the stopping time of two minutes may have been sufficient to enable the passengers to get off, but too short to allow the last one with much baggage to get on and to enable her escort to leave; and any sane man knows that if the train is started too quickly before a person can alight that he must either get off while the train is in motion or become entrapped and carried beyond the station. The evidence shows that those in charge of the train did not see Dallas leave the train, although he was in act of "making toward the door, but train was moving on, and he was about two windows from the door at the front end of the coach," when last seen by one of plaintiff's witnesses. There is no testimony to support the theory advanced by the defendant's attorney in argument that the deceased safely alighted and was struck while walking on the ground waving farewell to Elise; and the jury could not consider as a reasonable inference from the testimony any guess of counsel.

The charge of Judge Sease was full and free from error. If more than one reasonable inference could be drawn from the testimony, it was the duty of the jury to draw the conclusion and base its verdict thereon. Appellant based the second exception upon the proposition "that a verdict should have been directed for the defendant since the only reasonable inference to be drawn from the testimony was that the train stopped long enough for passengers to embark, and there was no evidence that an untimely starting of the train, or insufficient lights caused the injuries of plaintiff's intestate." Clearly, therefore, if more than one reasonable inference could be drawn from the testimony it was for the jury to say which one, if any, such reasonable conclusion should be drawn from all of the facts and circumstances in the case. The Court correctly so charged the jury.

In *Williamson v. Southern Railway Co.*, 183 S. C., 312, 191 S. E., 79, 84, this Court held that the trial Judge should

direct a verdict only when the testimony and all inferences which the jury could justifiably draw therefrom would be insufficient to support a verdict for the other party, citing numerous cases. In that case no one knew how the intestate was killed and the Court in discussing this phase of the case, stated: "The fact that an injury may have occurred in one of a dozen ways * * * would not defeat plaintiff's right of recovery if the evidence tended to sustain the reasonable probability of the one relied on."

In the recent case of *Oakman Service Station v. People's Oil Company*, 174 S. C., 517, 178 S. E., 129, 130, the Court quoted with approval from the case of *Lower Main Street Bank v. Caledonian Insurance Company*, 135 S. C., 155, 133 S. E., 553: " 'The well-established rule in this state is that if there is any testimony whatever to go to the jury on an issue involved in a cause, or even if more than one inference can be drawn from the testimony, then it is the duty of the judge to submit the cause to the jury. This is true, even if witnesses for the plaintiff contradict each other, or if a witness himself in his testimony makes conflicting statements. The credibility of witnesses is entirely for the jury. On a motion for a directed verdict, the evidence in the cause must be considered most favorably to the plaintiff.' "

Under the law of this State there was no error by the Court in impressing upon the jury the importance of reaching a verdict, nor was the jury coerced by anything said or done in this respect. It is as much the duty of the jury to decide the facts and render a true verdict as it is the duty of the Court to decide the questions of law and render a decision. The jury is the sole judge of the facts and the only tribunal to decide thereon and settle the case. The exception on this score is not well founded. The Judge who tried the case is the final authority to settle for appeal any mistakes in the transcript of the record by the Court stenographer who, although not infallible, is called upon to correctly take the charge, even if the usual court-room noise

or poor acoustics makes it difficult for him to do so. The Court stenographer cannot stop or interrupt the Judge in his charge and it is remarkable that so few mistakes are made by the faithful and efficient stenographer.

The statement by the trial Judge as to what transpired at the trial is final, even if the stenographic notes taken at the time show differently. *State v. Singletary,* 187 S. C., 19, 196 S. E., 527.

The record in the case at bar shows that the jury, after deliberating, returned to the courtroom and had not agreed on a verdict. The Judge, whose long experience on the bench and untiring services in the trial of a case display his impartiality and fairness, pointed out to the jury that the case had consumed nearly a day and a half in the trial, and that the jury had only been out a part of the day. He then commented upon the fact that the jury was composed of college men and men of affairs, intelligence, integrity and honesty. Also that another jury of twelve men would not be more able to thresh out and reach an agreement in the case. He also told them that "the Court has no interest in your final verdict, but the Court is interested in seeing that you deliberate and try to reach a verdict."

In the course of his remarks the Judge said: "If one man on the jury or more thinks that he knows it all, and would not yield his pride of opinion to reach a proper verdict he is no fit man to be on the jury. There is no one man that knows it all. In a jury room you listen and weigh the contentions of your fellow jurors in a spirit of trying to reach a conclusion."

The exception refers to this part of his charge and alludes to it as using the words "private opinion" in lieu of "pride of opinion." His Honor on motion for a new trial twice set forth, once verbally and later by written order, that "I used the expression 'pride of opinion' and not 'private opinion' as the stenographer has me using."

The record below should have been corrected accordingly and it was unnecessary to refer to any expression other than the use of words "pride of opinion." The entire charge and the context show that the words "pride of opinion" were employed to mean and did express the idea that a juror should not refuse to yield his arrogance of opinion that he knew it all and no one else knew anything. The word "pride" is defined to mean undue self-esteem, conceit, haughtiness or disdain for others. The jury could not have misunderstood that it was used in this sense, and in no way was coerced by the charge.

In view of the importance of the matter, and because the Court below followed the approved law of this State in his admonition to the jury, it is not amiss to quote at length from one of the most recent law books on the subject. This authority expressly announces the rule that when the jury return into Court unable to agree the Court may impress upon them the importance of agreeing, and urge them to listen to argument "and sacrifice the pride of personal opinion."

The following is taken *verbatim* from Reid's Branson Instruction to Juries:

"A trial Judge has no authority, either by threats, intimidation, undue urging, or inapt suggestion, to affect the fair, conscientious, and impartial deliberations of the jury, or to influence the conclusions they are to reach. The fact-finding body of the mixed tribunal should be as unhampered in the performance of their proper functions as the Judge is in his.

"The trial Judge may advise an unagreed jury of the importance of their reaching a verdict if they can do so without surrendering their conscientious convictions. But he can not go beyond that and say anything to the prejudice of either party. There is no prescribed language that he must use in this connection. What he may with propriety say must in a large measure be left to his good judgment. But as the

exclusive right to agree or not to agree rests with the jury, the Judge must not by threat or entreaty attempt to coerce a verdict or to exert his authority to force an agreement; nor must he under any circumstances or in any manner indicate the character of verdict that the jury should return." Citing *Terry v. Richardson,* 123 S. C., 319, 116 S. E., 273.

"While there must be nothing in the conduct of the trial Judge toward the jury savoring of undue pressure or coercion to reach a verdict, when the jury return into Court and announce their failure to agree, the Court may impress upon them the importance of agreeing, urge them to listen to argument and sacrifice the pride of personal opinion, and he may send them back for further deliberation until such time as it becomes apparent that hope of an agreement is futile. The Court is unauthorized to tell the jury, at any stage of the trial, that they must agree. The statement of a trial Judge to a disagreeing jury that they must arrive at a verdict, or language from which such peremptory order is logically inferred, is plain coercion and an invasion by the Court of the province of the jury. The trial Court should not direct such remarks or admonitions to the jury as will tend unduly to hasten them in arriving at a verdict. The trial Judge's authority over the jury does not extend to the coercing of a minority to agree with the majority merely in order to arrive at a verdict. The individual jurors are entitled to their own honest opinions as to the evidence in the case and the weight they will give it, and it is error for the trial Court to undertake to sway them from their convictions. If the words of the Court are so indiscreet as to constitute threats, intimidation, or disparagement of one or more jurors, there is no doubt of their coercive and improper character. It is not condemnatory conduct, however, for the trial Court to give a fair explanation of the duties of a disagreeing jury, nor to say to them that a minority should weigh the opinions of the majority and doubt the correctness of their own. But it is not permissible for the Court to threaten to keep the

jury together several days with only one meal a day if they do not reach an agreement, or to tell them that their meals will be furnished them at their own expense, or to threaten to take the jury to another County where the Judge is going to hold a term of Court, or to state to the jury: 'Don't you undertake to fool me by coming in here and saying that you have agreed to a mistrial. I should dislike to send such a good-looking body of men to jail, and that is what I would have to do.' " Citing *Fairey v. Haynes,* 107 S. C., 115, 91 S. E., 976.

"The trial Judge is without legal authority either expressly or impliedly to suggest that the jury compromise in order to arrive at an agreement. A compromise verdict is necessarily the result of the sacrifice by one or more jurors of their conscientious opinions in the case for the sake of agreeing upon a verdict. If the compromise is the result of improper directions or coercion by the trial Court, the verdict will be vacated on appeal." Reid's Branson Instructions to Juries, Vol. 1, 1936 ed., pages 138 to 142. Section 45.

The following is quoted from the *Terry case* (123 S. C., 319, 116 S. E., 275): "There can be no doubt that in admonishing juries of their duty to decide the case in hand, the trial judge should not use language that may fairly be construed as tending to encourage the surrender of conscientious convictions merely for the purpose of agreement. But we are clearly of the opinion that there is no such indication of undue pressure in the case at bar as would warrant this court in setting the verdict aside on that ground. The record fails to disclose how long the jury had been out when they returned to the courtroom and reported to the judge their inability to agree. Evidently, they had not had the case in their hands for such a length of time as to convince the presiding judge that their report was the result of 'due and thorough deliberation.' 'While a  *  *  *  judge may not coerce a jury, he is not precluded from indicating very plainly that he will not ·be coerced by the jury.' *State*

*v. Drakeford* [120 S. C. 400], 113 S. E. 307. After being sent back to their room, the jury returned in less than half an hour with the verdict which was rendered—a result just as consonant with the theory that the reported inability to agree had been due to failure to give the case due and thorough deliberation as that the verdict rendered was improperly reached on account of anything said by the judge. A very similar charge of Judge McIver has recently been sustained by this court in the case of *Coleman v. Stevens* [124 S. C. 8] 117 S. E. 305. * * * See *Harper v. Abercrombie,* 115 S. C. 360, 105 S. E. 749; *State v. Jones,* 86 S. C. 17, 67 S. E. 160; *Caldwell v. Duncan,* 87 S. C. 331, 69 S. E. 660; *Nickles v. Seaboard Air Line Railway,* 74 S. C. 102, 54 S. E. 255."

Therefore, all exceptions are overruled and the judgment below is affirmed.

Mr. Chief Justice Stabler and Mr. Justice Bonham concur.

Mr. Justice Baker concurs as to actual damages, and dissents as to punitive damages.

Mr. Justice Fishburne concurs in result.

Mr. Justice Carter did not participate on account of illness.